Jones, Judge,
delivered1 the opinion of the court:
This action was brought by the Excavating Equipment Dealers, Inc., to recover from the United States the reasonable value of the alleged retention and use by the defendant of one used P. & H. Model 206-B Dragline, which, with certain attachments, plaintiff claims was retained and used during the period from September 27, 1932 to May 12, 1933. Plaintiff also claims damages for repair, reconditioning, loading, and freight.
The plaintiff was incorporated under the laws of the State of Delaware. It was one of the two subsidiaries of the Harnischfeger Corporation, a Wisconsin corporation.
On August 10, 1931, the plaintiff made a conditional sale of the above machinery to Jacobson & Mortenson, contractors. Under the terms of the contract there was a cash payment, the balance being payable monthly. The title was retained in the plaintiff until all the installments should be paid.
The conditional sales contract was duly registered in the office of Judge of Probate, Tuscaloosa County, Alabama, on August 14, 1931.
On March 16, 1932, Jacobson & Mortenson entered into a contract with the United States by the terms of which the partnership agreed to install sewer and storm drainage systems at Corry Field (Naval Air Station), Pensacola, Florida.
*91 Jacobson & Mortenson transported the dragline equipment from Tuscaloosa County, Alabama, to Corry Field, Florida, and used it in the construction work at that place.
The surety on the Government contract was the National Surety Company.
The contractor abandoned the work on August 4, 1932, before its completion. The Surety Company elected not to complete the work and it was completed by the Government by the use of station labor.
Jacobson & Mortenson left on the site certain equipment among which was the dragline. Article 9 of the contract of the Government with Jacobson & Mortenson provided that in the event of termination by the Government, the latter might take over the work and prosecute the same to completion, and might utilize in completing the work such materials, appliances, and plant as might be on the site of the work and necessary therefor.
The dragline was used by the Government on October 4 and 5, 1932, in the digging of a trench for storm sewer pipes, it being a part of the work called for by the Jacobson & Mortenson contract.
On October 17, 1932, the plaintiff advised the defendant for the first time of its claim of the right to title and possession of the dragline equipment.
It was not used by the defendant after notice of such claim had been received.
The dragline was finally released to the plaintiff on May 12, 1933.
The primary question is whether there was an implied contract on the part of duly authorized United States officials to pay the reasonable rental value for the use of the dragline from the time the Government took possession of the property until the time the property was released, or any portion of such time.
We think that the peculiar facts and circumstances of this case are insufficient to justify the conclusion that there was such an implied contract.
It is true that the Government officials actually used this dragline on October 4 and 5, 1932, but at that time they had neither notice nor knowledge of any claim of ownership on the part of the plaintiff.
*92 There was also placed on the dragline the following legend “The United States has taken possession of this article which was furnished by Jacobson & Mortenson for use on the work under contract No. 1406, in accordance with Article IX of that contract.”
This had been placed on the dragline prior to notice or knowledge on the part of the defendant of any claim of interest by the plaintiff.
On October 17, 1932, a representative of the plaintiff visited Corry Field and for the first time notified the Public Works Officer of his claim that the dragline belonged to the plaintiff; that it had been sold on a conditional contract by the terms of which title was reserved in the plaintiff until all the installments had been paid; that the contractors, Jacobson & Mortenson, had defaulted in the payment due February 1, 1932, and on each succeeding monthly installment thereafter.
Plaintiff’s representative on October 17 or 18, 1932, interviewed the Public Works Officer in charge of the yard where-the machine was located. The officer informed plaintiff’s representative that he could not release the machine without authority from the Bureau of Yards and Docks. The Public Works Officer suggested that the Government might be interested in buying the dragline.
On October 20 the Sales Corporation offered the Public Works Officer a selling price of $5,000. Again he was informed that the Bureau of Yards and Docks would have to pass on all these matters.
The following day, October 21, 1932, the plaintiff wrote the Bureau of Yards and Docks a letter in which it suggested that as the title to the property remained in it, it was desirous of securing delivery thereof, but in the same letter stated it was entirely agreeable to having the Government use this machine to complete the job, if the Government would agree to pay a reasonable rental from September 27, 1932, until the work should be completed. It suggested $550 per month as a reasonable rental. Nothing was said in this letter about the offer of sale which the plaintiff had made to the Public Works Officer.
*93 On October 27 the Public Works Officer acknowledged receipt of the offer of sale made to him October 20,1932, and informed the plaintiff that a purchase could only be made through competitive bids.
We will first consider the period after October 17, 1932.
Neither the defendant nor any of its representatives ever used the dragline for any purpose after the notice that was given by plaintiff’s representative on October 17, 1932.
A great deal of correspondence was carried on by the officials of the plaintiff, the parent company and the sales company and their attorneys and representatives with the Surety Company and the Bureau of Yards and Docks of the Navy Department.
While some of this correspondence and apparent conversations seem surplusage, it was all done in an effort to clear the situation so that the property could be released.
The Bureau of Yards and Docks alone had the legal right to enter into a, contract for the use of the property. The action taken must be by a duly authorized officer. United States v. North American Transportation and Trading Co., 253 U. S. 330, 333. In order for the Government to be bound by such a contract it would be necessary for the duly authorized public authority, the Bureau of Yards and Docks, either to have made an express contract for the use, or to have conducted itself in such a way that there would be an implied contract to retain for use and to pay the reasonable rental value for such use or retention for use. United States v. Minnesota Mutual Investment Co., 271 U. S. 212, 217; Merritt v. United States, 267 U. S. 338, 341; Morse Dry Dock & Repair Co. v. United States, 77 C. Cls. 57, 73.
The evidence does not show that these officials ever claimed the right to use the dragline or that they claimed any right to hold it at any time after October 17, 1932, except insofar as it might be necessary to protect themselves and the Government from any just claims by anyone who might assert an interest in the property or a part thereof, or any other right in the premises.
Many complications arose in the effort to secure the release of the property. It was necessary to secure a release *94 from tbe National Surety Company. It developed in the course of the correspondence that a Kohler Lighting Plant had been attached to the property; that this did not belong to the plaintiff but had been attached by Jacobson & Mor-tenson. The question arose as to who had the authority for removing the lighting plant, and what ‘should be done with it.
It was necessary to secure release of a judgment against Jacobson & Mortenson which had been filed and under which a sheriff’s levy had been made. Then also the plaintiff claimed items for repair and reconditioning, the expense of loading the machine and hauling it to the station and the freight charge from Pensacola to Jacksonville. Naturally all these things took some time.
The release of the machine was further complicated by the fact that both the Harnischfeger Sales Corporation and the plaintiff filed separate claims for the property, each claiming to be the owner. On March 7, 1933, the National Surety Company wrote plaintiff’s attorney as follows:
We are in receipt of your letter of March 1st and in reply wish to say that it is our belief that this situation has been needlessly complicated owing to the fact that we have had claims for this particular equipment filed with us by both the Harnischfeger Sales Corporation and the Excavating Equipment Dealers, Inc., and we now find that they are one and the same concern, or at least their interests are mutual in this transaction and not antagonistic. Therefore, when we wrote the Bureau of Yards and Docks at Washington, it was necessary for us to assent to the delivery of this equipment to the proper legal owners as we, of course, were under the impression that two different concerns were claiming the same piece of equipment.
If you have the original retain[ed] title contract on this machine and will exhibit it to Commander Duncan, I am quite sure he will release the equipment to your clients. I am sending copy of this letter to Com. Duncan and suggesting that he turn over the equipment on the job to the parties who will exhibit to him legal evidence of ownership. I am further suggesting that he have the recipients execute a full and complete receipt to him for the equipment delivered.
I am also calling Com. Duncan’s attention to the fact that the lighting plant installed on the dragline by our *95 Principals, Jacobson & Mortenson, is no part of the equipment as claimed by the Excavating Equipment Dealers. I am therefore requesting Com. Duncan to retain the lighting plant in his possession subject to our further orders.
In the light of these circumstances and the complications and peculiar facts of this case, we believe that there was no legal obligation on the part of the Government to pay the plaintiff the reasonable rental value of the machine during any portion of the period after October 17, 1933.
The plaintiff company sold this machine to Jacobson & Mortenson as a second-hand and rebuilt machine. They received a cash payment of $1,250; they also received five monthly installments of $400 each, a total payment of $3,250. Default in payments had occurred February 1, 1932. No great diligence appears to have been shown by the plaintiff in tracking down the machine and asserting its right thereto.
While a considerable period elapsed after October 17 before the machine was finally released, it was a period scarcely as long as the plaintiff had taken in locating' the machine after the default in payment.
However, if there was any unreasonable delay or negligence on the part of the Government officials in releasing the machine, it would be a matter of tort and not of contract, and therefore not within the jurisdiction of this court at the time this cause of action arose. Hijo v. United States, 194 U. S. 315, 323; Bigby v. United, States, 188 U. S. 400, 405; Hill v. United States, 149 U. S. 593, 598.
As to the 20 days’ retention for use, including 2 days actual use, made of the dragline prior to October 17, this was done pursuant to the express provisions of Article 9 of the contract which gave the Government the authority to use this property in completing the work after the abandonment by the contractor. It was done before anyone connected' with the Government had any notice or knowledge of any claim of interest by the plaintiff.
This period presents a different and somewhat more difficult phase of the problem. However, in order to come within the jurisdiction of this court the taking must be *96 made under such circumstances as to give rise to a contract, express or implied in fact, to pay compensation. Hill v. United States, supra; Schillinger v. United States, 155 U. S. 163; Belknap v. Schild, 161 U. S. 10; John Horstmann Co. v. United States, 257 U. S. 138, 146. Hence, this action must rest on a contract implied in fact. Harley v. United States, 198 U. S. 229; United States v. Buffalo Pitts Co., 234 U. S. 228.
It is difficult to see how there could be any privity of contract, any implied meeting of the minds, either express or implied by circumstances, at a time when the defendant had no knowledge of plaintiff’s claim of interest and the plaintiff did not know the machine was in the custody of defendant.
A construction contractor had defaulted. The machine was in his possession and on the ground at the time it was taken over. It was taken over under the plain terms of the contract in which the plaintiff had no part. If, at the time of such use, the defendant had known of the plaintiff’s claim of interest, a different question would be presented.
The plaintiff also claims the expense of loading for shipment, the cost of transportation by freight from Pensacola to Jacksonville, and the expense of reconditioning the machine. Manifestly these expenses are not recoverable. The Government found the dragline on the property. It was not obligated to transport it or deliver it to any other point. Riggsbee v. United States, 58 C. Cls. 93, 97, 98.
Before the Government took over the property it was used for 799 hours by the contractor in heavy work at Corry Field in removal of roots, stumps, logs, and other heavy excavation.
The Government actually used the property for only 16 hours, and that in light excavation work. During that period the damage was negligible.
In addition to being a second-hand rebuilt machine at the time it was sold to the contractor it had been used by him prior to the time it was brought to Corry Field. It had been exposed to unusually bad weather conditions in September 1932.
*97 We tbink there is no substantial claim for damages for any of these items.
We find that there was no unreasonable delay in returning this property.
Judgment will be entered in favor of defendant.
It is so ordered.
Littleton, Judge; Green, Judge; and Whaley, Ohief Justice, concur.
Whitaker, Jfudge, took no part in the decision of this case.